UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CINDY A. ANAMAN,

                 Plaintiff,                           Civil Action No. 14-12278
                                              Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.

_____/

**OPINION AND ORDER GRANTING THE COMMISSIONER'S MOTION FOR
SUMMARY JUDGMENT [19] AND DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT [15]**

Cindy Anaman ("Anaman") commenced this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties filed motions for summary judgment and have consented to this Court's conduct of all proceedings, including the entry of a final judgment, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Anaman is not disabled under the Act. Accordingly, the Commissioner's motion for summary judgment [19] is GRANTED, Anaman's motion for summary judgment [15] is DENIED and, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is AFFIRMED.

I.     **Procedural History**

In October 2011, Anaman filed the instant application for DIB and SSI, originally

alleging a disability onset date of November 1, 2007, which she later amended to May 23, 2011. (Tr. 72-73, 258, 266).   The claims were initially denied on March 8, 2012. (Tr. 115-16). Thereafter, Anaman filed a timely request for an administrative hearing, which was held on September 12, 2012 before ALJ Mary Ann Poulose. (Tr. 67-92).  Anaman, who was represented by attorney Matthew Thibodeau, testified at the hearing, as did vocational expert Michelle M. Peters-Pagella. (*Id.*).  In a written decision dated November 30, 2012, the ALJ determined that Anaman was disabled. (Tr. 132-33).  On July 26, 2013, the Appeals Council vacated the hearing decision on the ground that the ALJ based her disability finding on the erroneous testimony of the VE that a hypothetical claimant, "who could perform light work with only occasional bilateral handling and fingering and who must avoid hazards such as unprotected heights, moving machinery, and commercial driving," would be unable to perform any work in the national economy. (Tr. 137).   After identifying three occupations in the Dictionary of Occupational Titles ("DOT") that "appear[ed] to comport with the requirements of the hypothetical question posed to the vocational expert" (namely, hostess, school bus monitor, and "barker"), the Appeals Council remanded the matter to the ALJ in order to obtain "supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational bases and to resolve the apparent inconsistencies" with the DOT. (*Id.*).

On remand, an administrative hearing was held on November 12, 2013 before ALJ Joy Turner. (Tr. 37-66).  Anaman testified at the hearing with the assistance of her attorney, Ann Sharkey, as did vocational expert Mark Richards. (*Id.*).  This time, Anaman informed the ALJ that her alleged disability onset date was November 1, 2007. (Tr. 16, 42).  In a written decision dated December 11, 2013, the ALJ determined that Anaman is not disabled. (Tr. 29-30).  On May 13, 2014, the Appeals Council denied review. (Tr. 1-5).  Anaman filed for judicial review

of the final decision on June 10, 2014. (Doc. #1).

**B.     Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability."  *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant

part as the:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last
> for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . . physical or
> mental ability to do basic work activities," benefits are denied without
> further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity,
> has a severe impairment that is expected to last for at least twelve months,
> and the severe impairment meets or equals one of the impairments listed in
> the regulations, the claimant is conclusively presumed to be disabled
> regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant
> work, if other work exists in the national economy that plaintiff can
> perform, in view of his or her age, education, and work experience,
> benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240, at *21

(E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r*

*of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).   "The burden of proof is on the claimant throughout the first four steps . . . [i]f the analysis [then] reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."   *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

    **C.**    **Background**

        *1.*    *Disability Reports*

In an undated disability report, Anaman indicated that she suffers from vertigo, fibromyalgia, right shoulder damage, carpal tunnel syndrome, irritable bowel syndrome, diverticulosis, and "problems" with her left and right hands.  (Tr. 313).  Anaman reported that she stopped working on May 1, 2011, as a result of these conditions. (*Id.*).  With respect to her education level, Anaman completed the twelfth grade, but never pursued any further studies. (Tr. 314).  Prior to stopping work, Anaman was employed as a cleaning technician and a custodian. (*Id.*). Anaman stated that Vassel Ahmad, M.D. is her treating physician. (Tr. 317).  At the time of the report, Anaman was taking amlodipine besylate for high blood pressure, aspirin for heart related issues, meclizine for vertigo, Prilosec for heartburn, paroxetine for anxiety, and Vicodin for pain relief. (Tr. 316).

In a November 11, 2011 function report, Anaman stated that she lives alone in a mobile home. (Tr. 325).  When asked to describe her daily activities, Anaman indicated that she eats and watches television. (Tr. 326).  She cannot lift, push or pull without experiencing "extreme pain" in her hands, wrists, shoulder and back. (Tr. 325).  Anaman reported that she has difficulty sleeping because of dizziness and nausea along with "pain throughout my body, hips, back legs, hands, arms and shoulders." (Tr. 326).  As for personal hygiene, Anaman indicated that dressing herself takes longer that it used to; she can only take showers because she has difficulty exiting a

4

bathtub; she must sit down before shaving her legs; and she must use a soft seated toilet to prevent leg cramps and hip pain. (*Id.*). In addition to preparing her own meals, Anaman reported that she is able to perform household chores such as washing laundry, cleaning dishes and vacuuming, but that it sometimes takes her three days to complete these chores. (Tr. 327). She does require some assistance with carrying wet laundry and scrubbing dishes, although she cannot perform any yard work "[b]ecause the pain is so bad." (*Id.*). Anaman indicated that she can travel by herself and that she goes grocery and clothing shopping once a week. (Tr. 328). She is able to walk, drive a car, and sit in the passenger seat. (*Id.*). Anaman is capable of paying bills, counting change, and handling a checking account. (*Id.*). As for hobbies, Anaman stated that she can no longer play horseshoes, go bowling, or hold a rifle for the purpose of target practice. (Tr. 329). Anaman socializes with her friends while playing card games and board games once or twice a week. (*Id.*). She further noted that she generally does not have any problems getting along with family, friends, or neighbors. (Tr. 330).

When asked to identify functions impacted by his condition, Anaman checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, completing tasks, concentration, and using hands. (*Id.*). She can walk "a few blocks" before needing to stop and rest. (*Id.*). She can follow verbal and written instructions and gets along with supervisors. (Tr. 331). Anaman also indicated that she does not handle stress or changes in routine well. (*Id.*). Regarding the use of assistive devices, Anaman wraps her wrists in splints in the evening and she noted that her doctor recommended using a cane to ambulate. (*Id.*). Regarding her medications, Anaman reported taking meclizine and paroxetine, both of which cause drowsiness and some dizziness. (Tr. 332).

Additionally, the record reflects that Anaman's boyfriend, Paul Savage, drafted a third-

5

party function report dated November 13, 2011. (Tr. 349-56).  Savage's report is largely consistent with Anaman's, although he did not indicate any diminished capacity with respect to Anaman's concentration and memory. (Tr. 354).

2.    *Anaman's Testimony*

At the time of the November 12, 2013 hearing before the ALJ, Anaman stated that she lives with her boyfriend in a mobile home. (Tr. 43).  She alleged a disability onset date of November 1, 2007. (*Id.*).  Anaman testified that she drives her car approximately three times a week for about five to 10 miles per outing. (Tr. 44).  She complained that her vertigo limits the distance she can drive and that her hands become numb and "tingly" when she holds the steering wheel for long periods of time. (*Id.*).  From November 1, 2007 through May 2011, Anaman attested that she worked as an office cleaner for a medical facility. (Tr. 45).  Anaman stated that her work involved dusting, mopping, vacuuming, cleaning furniture, climbing ladders and reaching. (*Id.*).  The heaviest weight she lifted at this job was 20 pounds. (Tr. 46).  She also worked as a hazardous material cleaner from 2002 through 2006, at which point she injured her collarbone. (*Id.*).  The heaviest weight she lifted was 40 pounds. (Tr. 47).

After summarizing some of her other past relevant work, Anaman stated that she is no longer capable of working due to symptoms related to vertigo, irritable bowel syndrome, hearing loss, diverticulosis, and pain in her hands. (Tr. 49).  Anaman attested that she has been diagnosed with fibromyalgia, which causes significant pain in her joints, hips, legs and feet. (Tr. 50).  She wears leg braces during the day, and at night, and takes medication for anxiety, vertigo, heartburn and allergies. (Tr. 50-51).  She can only carry a gallon of milk with two hands, and depending on her pain level, she is able to stand anywhere from five to 10 minutes to one hour. (Tr. 52).  Anaman can sit from 20-30 minutes to "a couple of hours," and she is able to walk for

20-30 minutes, although she must have someone accompany her because she is susceptible to frequent falls. (Tr. 53). Anaman suffers from anxiety attacks once or twice a week and these episodes generally last for approximately five to 10 minutes. (*Id.*).

Regarding her daily routine, Anaman testified that she is able to use the bathroom on her own, feed herself, do the laundry and wash the dishes, but that she must stop whatever she is doing when her pain increases. (Tr. 54). When she is in pain, Anaman watches television for the remainder of the day and she takes one to two hour naps on most days. (*Id.*). Her fine motor coordination remains unaffected on the days when she does not experience significant levels of pain. (Tr. 55). Anaman described these pain levels in terms of "good days" and "bad days" and that she has "good days" four days a week. (Tr. 56). On "bad days," Anaman stated that she "doesn't get dressed. I just use the bathroom and stay in bed all day or on the floor or on the couch. I don't do anything." (*Id.*).

Anaman related that her hand doctor recommended carpal tunnel surgery on both hands although he could provide no assurance that she would recover complete functionality. (Tr. 57). On account of the pain in her wrists, Anaman stated that she does not use a cane to ambulate. (Tr. 58). She also has difficulty hearing and must use the speaker function on her phone to understand conversations. (Tr. 59). Because of her irritable bowel syndrome, Anaman estimated that she uses the bathroom between 20 to 25 times a day and indicated that her past work was able to accommodate her condition because "there was a toilet around every corner." (*Id.*).

### 3. *Medical Evidence*

The Court has thoroughly reviewed the record, and will discuss the relevant medical evidence within the analysis portion of this Report and Recommendation.

4.      *Vocational Expert's Testimony*

Mark Richards testified as an independent vocational expert ("VE"). (Tr. 59-66).  The ALJ asked the VE to imagine a claimant of Anaman's age, education, and work experience, who would be limited to light unskilled and/or semi-skilled work; occasional handling and fingering with bilateral upper extremities; avoid concentrated exposure to hazardous machinery and heights; and must avoid commercial driving. (Tr. 61).  The VE stated that the hypothetical individual would not be able to perform any of Anaman's past relevant work, but would be capable of working in the positions of children's attendant (700 jobs in Michigan); counter clerk (1,800 jobs in Michigan); and gate guard (2,000 jobs in Michigan). (Tr. 61-62).  The ALJ then inquired whether the same hypothetical claimant would be able to perform the above-listed jobs with the further limitation of avoiding concentrated exposure to noise. (Tr. 62).  The VE confirmed that the hypothetical individual could still perform those jobs even with this more restrictive limitation. (*Id.*).

For a third hypothetical, the ALJ asked whether the same hypothetical claimant would be able to perform Anaman's past relevant work at the sedentary level. (*Id.*).  The VE answered that the hypothetical individual would unable to perform any of Anaman's past relevant work, but would be capable of working in the positions of surveillance monitor (144 jobs in Michigan, 6,000 nationwide); telephone solicitor (4,000 jobs in Michigan, 232,000 nationwide); callout operator (1,000 jobs in Michigan, 48,000 nationwide). (Tr. 63-64).  The VE further noted that the telephone solicitor position, which requires occasional reaching and handling and frequent fingering under the DOT, is typically performed with the use of a headset and auto-dialers. (Tr. 64).  Finally, the ALJ inquired whether an imagined claimant with the above limitations could perform Anaman's past relevant work if he or she would be off-task 20 percent of the time or

8

more due to impairments and absent three or more times a month. (Tr. 65). The VE responded that such an individual would be precluded from Anaman's past relevant work as well as any other jobs in the national economy. (*Id.*).

### D.      The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Anaman is not disabled under the Act. At Step One, the ALJ found that Anaman engaged in some substantial gainful activity since November 1, 2007, the alleged disability onset date. However, the ALJ ultimately concluded that Anaman had not engaged in substantial gainful activity in 2008, 2010, and from 2011 through the date of the December 11, 2013 decision. (Tr. 18-19). At Step Two, the ALJ found that Anaman has the severe impairments of dysfunction of major joints, fractures of the upper extremity, ischemic heart disease, carpal tunnel syndrome, vestibular system disorder, substance addiction disorder, and anxiety. (Tr. 19). At Step Three, the ALJ found that Anaman's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 19). The ALJ then assessed Anaman's residual functional capacity ("RFC"), concluding that she is capable of performing light work with the following limitations: occasional handling and fingering with bilateral upper extremities; avoidance of concentrated exposure to unprotected machinery and heights; avoidance of commercial driving; and performance of simple and routine tasks. (Tr. 22).

At Step Four, the ALJ determined that Anaman is unable to perform any past relevant work as a cleaner, change-house attendant, or salesperson. (Tr. 28). At Step Five, based in part on the VE's testimony, the ALJ concluded that Anaman is capable of performing a significant number of jobs that exist in the national economy. (Tr. 29). As a result, the ALJ concluded that Anaman is not disabled under the Act. (Tr. 29-30).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Anaman v. Sec'y of Health*

10

*& Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (stating that "an ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.  Analysis

Anaman argues that the ALJ used an incorrect disability onset date to evaluate her claim for benefits.  She also argues that the ALJ's RFC assessment that she could perform light work is not supported by substantial evidence.  The Court will address these arguments in turn.

#### 1.  Disability Onset Date

When Anaman filed her initial claim for benefits she designated November 1, 2007 as the alleged disability onset date. (Tr. 258, 266).  Later, during her initial hearing before ALJ Poulose on September 12, 2012, Anaman amended the disability onset date to May 23, 2011. (Tr. 72-73).  However, at the November 12, 2013 hearing before ALJ Turner (after the Appeals Council had remanded the matter), the ALJ asked Anaman (who was represented by counsel at the time (Tr. 39)) whether November 1, 2007 was "the date you are alleging you became disabled," to which Anaman responded, "Yes.  I had to think about it."  (Tr. 42).  Consequently, ALJ Turner considered Anaman's medical records from as far back as February 2007 to determine her disability status. (Tr. 23).  Anaman now argues that the ALJ should have retained the alleged

onset date from the initial hearing and solely reviewed the medical evidence from May 2011 onwards. In light of the circumstances, the Court disagrees. Moreover, even if the ALJ's use of the earlier alleged onset date was in error, the Court finds that that error was harmless and does not require remand.

Social Security Ruling 83-20 provides guidance for determining a claimant's disability onset date, which is defined as "the first day an individual is disabled as defined in the Act and the regulations." Soc. Sec. Rul. 83-20, 1983 SSR LEXIS 25, at *2 (1983). Pursuant to this ruling, "[i]n determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available," *id.* at *6, and any "change in the alleged onset date may be provided in a Form SSA-5002 (Report of Contact), a letter, another document, or the claimant's testimony at a hearing." *Id.* at *4. In this case, Anaman specifically amended her disability onset date to November 1, 2007 during a brief colloquy with the ALJ at the second hearing. (Tr. 42). And this date is consistent "with the medical evidence of record" dating back to February 2007. *Id.* at *6; *see also Borum v. Comm'r of Soc. Sec.*, No. 10-14800, 2011 U.S. Dist. LEXIS 151070, at *32 (E.D. Mich. Dec. 20, 2011) (holding that "the ALJ did not commit any error in relying upon the disability onset date that Plaintiff himself alleged."). Furthermore, since Anaman was represented by counsel at the hearing, the ALJ should have been "entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). Thus, the ALJ did not err when she accepted Anaman's testimony, changing the alleged disability onset date back to November 1, 2007, because counsel was present during the hearing and declined to correct or clarify Anaman's statement regarding this amendment. *See Castell v. Comm'r of Soc. Sec.*, No. 07-12641, 2008 U.S. Dist. LEXIS 112957, at *12-13 (E.D.

Mich. Apr. 11, 2008) (holding that ALJ permissibly relied upon representations in counsel's letter that plaintiff agreed to amend the alleged disability onset date).

Moreover, even if, in light of the circumstances of the Appeals Council remand, the ALJ erred in using the earlier alleged onset date, that error was harmless. As discussed below, the ALJ adequately discussed the medical evidence and other record evidence from the May 2011 time period forward, and explained why it supported her finding that Anaman was not disabled. (Tr. 24-26, 28).

### 2.     *RFC Assessment*

Next, Anaman maintains that the ALJ's RFC finding that she could perform light work is not supported by substantial evidence. The Court disagrees.

Anaman argues that ALJ Turner's decision "failed to articulate how a light RFC was arrived at." (Doc. #15 at 8, 12). This is not a fair characterization of the ALJ's decision on this issue. The ALJ specifically noted that she was giving weight to state agency reviewer, Robert Nelson, M.D.'s opinion "that [Anaman] has the [RFC] to perform light work with [certain limitations]" because she found that "opinion is consistent with the credible medical evidence of record." (Tr. 26). As discussed below, substantial record evidence supports this finding.

First, the ALJ properly noted that Anaman's activities of daily living belie her allegations of disabling impairments and support the RFC. (Tr. 27-28). Specifically, the ALJ wrote that "in [Anaman's] November 2011 Function Report she stated that she is able to take care of her pets, prepare meals, wash laundry, clean dishes, drive a car, shop for groceries…[and] stated that her hobbies included watching television, playing scrabble, playing cards, playing Yahtzee, playing Wii [video games], dancing, 'music,' and crafts." (Tr. 28). Anaman indicated that she goes to the doctor's office, grocery store and drug store on a "regular basis," and that she shops for

13

groceries and other personal items weekly (in stores, on the phone, by mail and on the computer), spending "as long as it takes." (Tr. 329). The ALJ also noted that Anaman had been running on a treadmill in the June 2012 time period. (*Id.*).

With respect to Anaman's physical impairments, the ALJ cited ample record evidence to support her RFC determination. The ALJ specifically cited medical records indicating that Anaman consulted with cardiologist John F. Collins, M.D. in January 2010 after complaining of chest pain that radiated to her throat, dyspnea, severe nausea, and weakness. (Tr. 23, 620). After her physical examination, Dr. Collins noted that Anaman's heart rate and rhythm were normal; she exhibited no murmur, rub, or gallop; and no edema was found in the lower extremities. (Tr. 621). Thereafter, Anaman received a left heart catheterization and left ventriculography which showed mild artherosclerosis. (Tr. 618). Dr. Collins noted that this condition could be treated medically. (*Id.*). Anaman also underwent a nuclear myocardial perfusion scan that revealed a small infarct in the anteroseptal myocardium and left ventricular ejection fraction of 59 percent. (Tr. 876). An echocardiogram indicated no chamber enlargement; normal left ventricle function; and unremarkable images of the pericardium and mitral valve. (Tr. 868).

The medical record shows that Anaman received treatment from Bassel Ahmad, M.D., in December 2008 and February 2009. At that time, Dr. Ahmad diagnosed her with musculoskeletal pain although she did not exhibit significant signs of arthritis or fibromyalgia. (Tr. 571, 575). The ALJ reviewed Dr. Ahmad's treatment records from March 2010, noting that Anaman presented with symptoms of recurrent moderate joint pain, particularly in her hips and knees. (Tr. 23, 411). She also complained of pain and numbness in her hands; pain radiating below the joints; and pain "sometimes in the right shoulder."[1] (Tr. 411). Dr. Ahmad noted a

---

[1] In February 2007, prior to the alleged disability onset date, Louis C. Almekinders, M.D.,

14

history of alcoholism, but "[n]o depressive symptoms or anxiety." (*Id.*).  The doctor diagnosed Anaman with mild coronary artery disease, arthralgia coupled with morning stiffness, and stable hypertension. (Tr. 412).  Diagnostic X-rays of the right knee and left hip were unremarkable. (Tr. 634-35).

The ALJ noted that in April 2010, Dr. Ahmad found no crepitation in Anaman's knees and no pain or tenderness in her wrists. (Tr. 23, 413).  Despite the doctor's warning regarding the side effects associated with prolonged use of ibuprofen, Anaman continued to use this medication to treat her pain. (Tr. 413-14).  Dr. Ahmad again indicated a diagnosis of generalized arthralgia with musculoskeletal pain. (Tr. 413).   The ALJ considered the results of Anaman's consultation with rheumatologist, Harris Weaver, M.D., in May 2010. (Tr. 24, 407-08).  Upon physically examining her, Dr. Weaver concluded that Anaman "is probably hypothyroid with secondary carpal tunnel syndrome." (Tr. 407).  Although the doctor surmised that Anaman could be suffering from fibromyalgia, he was hesitant to diagnose her with this condition as she was not "clearly euthyroid." (*Id.*).  Aside from a potential diagnosis of fibromyalgia, the doctor opined that he did not believe that Anaman exhibited "any other inflammatory/autoimmune problem." (*Id.*).

The ALJ noted that in May 2011, after falling on both of her wrists, Anaman visited John P. Backstrom, D.O., for an evaluation of her injuries. (Tr. 24, 435).  X-rays confirmed that Anaman fractured the right distal radius. (Tr. 435).  Following an operation on May 31, 2011 (Tr. 446-48), Dr. Backstrom noted "respectable range of motion to the [right] wrist and flexion

---

evaluated Anaman's right shoulder after she complained of intermittent, painful popping in that area. (Tr. 936).  She claimed that the symptoms worsened with daily activities and that an earlier shoulder cuff repair surgery did not alleviate her pain. (*Id.*).  Dr. Almekinders diagnosed Anaman with shoulder sprain, "possibly associated with arthritis," and referred her for a CT scan. (Tr. 938).

and extension.  She has full supination and pronation is about 45-50 degrees." (Tr. 432).  X-ray images over the course of the next several months indicated that the right wrist "look[ed] to be healing well." (Tr. 426).  In October 2011, Anaman complained of pain in the left and right wrists although X-rays of both wrists appeared to be normal. (*Id.*).  The ALJ considered additional evidence from this time period demonstrating that Anaman informed Dr. Ahmad that she was suffering from recurrent dizziness. (Tr. 647).  After conducting a physical examination, he diagnosed her with chronic dizziness, or in the alternative, vertigo. (Tr. 647).  The doctor continued to treat Anaman with meclizine, which provided intermittent relief from her vertigo-related symptoms. (*Id.*).  This diagnosis had been confirmed by Dr. Meihui Ma, M.D., who saw Anaman in July 2011, and opined that her condition was vestibular as opposed to neurological. (Tr. 594).  The doctor recommended that Anaman undergo vestibular rehabilitation therapy. (*Id.*).  Anaman reported improved symptoms after she stopped using Lisinopril to treat her hypertension. (Tr. 652).

The ALJ also evaluated Anaman's treatment records with Kagan Ozer, M.D., who evaluated the residual pain in both of her wrists and numbness in her fingertips. (Tr. 24-25, 474-77).  His examination revealed that Anaman could flex her right wrist approximately 40 degrees and extend to 35 degrees. (Tr. 475).  She could flex her left wrist 50 degrees and extend to 50 degrees. (*Id.*).  Anaman did have "some pain" in her right wrist when exhibiting range of motion and a "palpable clunk appreciated throughout her range of wrist motion." (*Id.*).  Dr. Ozer diagnosed Anaman with a post-surgical right wrist fracture and carpal tunnel syndrome.  (*Id.*).  The doctor further opined that Anaman's left wrist pain was most likely related to carpal tunnel syndrome and scaphoid nonunion. (*Id.*).  He recommended that Anaman undergo an EMG and CT scan of the right wrist. (*Id.*).  A later CT scan showed a small wrist joint effusion, a small

16

amount of subcutaneous soft tissue edema, and small areas of nonbridging callus formation in the dorsal aspect of the distal radius. (Tr. 25, 490).

When Anaman followed up with Dr. Ozer in February 2012, she exhibited bilateral carpal compression, positive Tinel's sign at the right wrist and negative Tinel's sign at the left wrist. (Tr. 25, 491).  Anaman also could "make a full fist and fully extend the digits equally in the hands bilaterally." (*Id.*). Dr. Ozer reviewed the results of a January 2012 EMG, which he designated as "normal." (*Id.*).  The EMG results indicated mild right carpal tunnel syndrome with no denervation and median neuropathy on both sides. (*Id.*).  Dr. Ozer opined that Anaman suffered from mild carpal tunnel syndrome and recommended that she undergo an ulnar shortening osteotomy of the right wrist to alleviate her pain. (Tr. 492).  As for the left wrist, the doctor recommended bone grafting with screw fixation of the scaphoid nonunion. (*Id.*).

During Anaman's May 2012 appointment with Dr. Ozer, she demonstrated five out of five strength in her biceps, triceps, hand intrinsics, wrist flexion and extension. (Tr. 923).  However, the doctor noted that Anaman had a positive Tinel's sign and was tender to palpation over the distal ulna and the extensor carpi ulnaris tendon in her right wrist. (*Id.*).  As for the left wrist, Anaman was tender to palpation in her anatomic snuffbox and over her scaphoid. (*Id.*). Dr. Ozer questioned whether Anaman could obtain any further pain relief from surgery in light of her fibromyalgia. (*Id.*).[2]

The ALJ also reviewed Dr. Ahmad's June 2012 treatment notes, which indicated that Anaman injured her right knee "while running on a treadmill" and was suffering from swelling

---

[2] Post-hearing evidence submitted by Anaman's attorney relating to Dr. Jose Mari G. Jurado M.D.'s evaluation of an April 3, 2014 EMG revealed only mild carpal tunnel syndrome in the right wrist, without denervation, moderately severe carpal tunnel syndrome in the left wrist, again without denervation, mild left ulnar neuropathy without denervation, and a normal right ulnar.  (Tr. 970-72).

in the area along with localized pain. (Tr. 25, 566).  She reported continued musculoskeletal pain, which she described as "generalized, moderate, [and] recurrent." (Tr. 566).  Dr. Ahmad diagnosed her with "possible fibromyalgia." (Tr. 565).  Thereafter, in September 2012, Dr. Ahmad diagnosed Anaman with dizziness and recommended that she consult with a neurologist. (Tr. 946).

The ALJ noted that Anaman again visited Dr. Ma in November 2012 after complaining of short-term memory loss. (Tr. 25-26, 948-949).  Upon a physical examination, Dr. Ma concluded that Anaman displayed no ataxia, had a negative Romberg test, and was able to perform tandem walking "but a little bit unsteady."  (Tr. 951).  Dr. Ma also concluded that Anaman did not have Wernicke-Korsakoff syndrome and described her memory issues as "quite mild." (Tr. 949-51).  The doctor diagnosed Anaman with intermittent vertigo or dizziness, which she still attributed to vestibular issues related to hearing loss and "chronic alcohol use."  (Tr. 951; *see also* Tr. 963 (noting that Anaman was advised that she may have balance problems due to alcohol use).  The Court notes that an August 2012 medical record indicates that Anaman reported that she was not suffering from any dizziness at the time (Tr. 948), and during an auditory evaluation with the Miracle Ear Center in June 2013, Anaman responded in the negative when asked whether she suffered from "[a]ny acute or chronic dizziness."  (Tr. 967; *see also* Tr. 969).

Regarding Anaman's mental impairments, the ALJ also found sufficient evidence in the medical record to support her RFC assessment.  The ALJ reviewed Dr. Ahmad's treatment notes from December 2008, indicating that Anaman drinks alcohol "to calm her[self] down." (Tr. 26, 575).  Dr. Ahmad diagnosed Anaman with anxiety and informed her that he would prescribe medication for the condition only if she decreased her alcohol consumption. (*Id.*).  By February

18

2009, Anaman informed Dr. Ahmad that she was "doing fine and she is learning how to deal with her problems." (Tr. 571).  She declined a prescription to treat her anxiety. (*Id.*).  In June 2012, the ALJ noted that Dr. Ahmad determined Anaman had "moderately severe depression" based on her responses to a PHQ-9 questionnaire. (Tr. 565).

The ALJ additionally cited the psychiatric evaluation that Tricia Curtis, L.M.S.W., performed on Anaman in September 2012. (Tr. 27, 961-63).  Curtis found signs of mild depression and noted that Anaman's thought content was depressed. (Tr. 963).  She diagnosed Anaman with post-traumatic stress disorder, recurrent major depressive disorder without psychotic features, and ruled out alcohol dependence. (*Id.*).  She also assigned Anaman a Global Assessment of Functioning ("GAF")[3] score of 45. (*Id.*).  While Curtis described Anaman as glum, she noted that Anaman was attentive and fully communicative. (Tr. 961).  Anaman notably exhibited "[m]ild but diffuse memory loss with difficulty remembering recent events;" fair insight into problems; fair social judgment; no signs of hyperactive or attentional difficulties; and no signs of withdrawal or intoxication were evident. (*Id.*).

With respect to the opinion evidence, the ALJ accorded some weight to the RFC assessment of the state agency reviewer, Robert Nelson, M.D., who concluded that Anaman could occasionally lift 20 pounds; frequently lift 10 pounds; sit/stand for six hours in an eight-hour workday; and push or pull objects without limitation. (Tr. 111-112).  Due to her carpal tunnel syndrome, Dr. Nelson limited Anaman's capacity for handling and fingering to "frequent bilaterally" (Tr. 112), and ultimately found her capable of performing light work. (Tr. 113).  In light of the foregoing discussion, substantial evidence supports the ALJ's finding that Dr.

---

[3]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

Nelson's opinion was "consistent with the credible medical evidence of record," and her incorporation of Dr. Nelson's limitations into Anaman's RFC.  (Tr. 26).

The also Court finds that the ALJ properly discounted Dr. Almekinders's May 2007 statement that Anaman was permanently disabled due to her "shoulder problem" (Tr. 450), as well as Linda C. Runyon, M.D.'s March 2011 opinion that Anaman is "unable to work" (Tr. 784), because none of the doctors' treatment notes provided any discussion of the cause, severity, symptoms, prognosis, or any other details which might substantiate their assertions. Moreover, both of these opinions are not due any special deference because disability determinations are solely reserved to the Commissioner. *See Pratt v. Comm'r of Soc. Sec.*, No. 13-872, 2014 U.S. Dist. LEXIS 134226, at *7 (W.D. Mich. Sep. 24, 2014) (citing 20 C.F.R. § 404.1527).

Finally, Anaman's contention that the ALJ's RFC finding did not encompass Dr. Ahmad's opinion limiting her to "low stress work," lacks merit for at least two reasons.  First, Dr. Ahmad's opinion was entirely predicated on his conclusory statement that Anaman suffers from "mood swings" (Tr. 690), and the doctor failed to specifically address how this emotional behavior impacted Anaman's capacity to work.  Second, the ALJ evaluated Anaman's November 2011 function report and accurately determined that her "daily activities . . . are not limited to the extent one would expect, given the complaint of disabling symptoms and limitations." (Tr. 27-28).  This conclusion is supported by substantial evidence.  As discussed above, Anaman reported in her November 2011 function report to being able to engage in numerous activities which require a certain level of sustained concentration.  For example, Anaman reported that she can drive a car by herself (Tr. 328), play board games such as Scrabble and Yahtzee, and Wii video games, and that she works on "crafts" (Tr. 329).  All of these self-reported activities not

20

only involve a significant amount of concentration and/or attention to detail, but they undermine Dr. Ahmad's barebones assessment that Anaman should be limited to "low stress work" because her mood swings constitute some form of unspecified concentrational limitation.  At any rate, as the ALJ indicated (Tr. 27), the RFC he adopted adequately addressed these limitations by restricting Anaman to simple and routine tasks, which, as Anaman admits, is consistent with the hypothetical limitation posed to the VE of unskilled work. (Tr. 22; *see also* Tr. 961 (Curtis evaluation finding no signs of attentional difficulties); Doc. #15 at 14).  Therefore, a remand requiring the ALJ to specifically consider Dr. Ahmad's conclusory opinion in formulating the RFC is not warranted.

In sum, the ALJ provided a detailed, extensive and well-reasoned discussion of the medical record, and her RFC analysis is supported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for summary judgment [19] is GRANTED, Anaman's motion for summary judgment [15] is DENIED, and the Commissioner's decision is AFFIRMED.


Dated: July 8, 2015                         s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge



## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 8, 2015.

                                            s/Eddrey O. Butts
                                            EDDREY O. BUTTS
                                            Case Manager